**SERVICETRENDS, INC., Plaintiff,**

v.

**SIEMENS MEDICAL SYSTEMS, INC., Defendant.**

Civ. A. No. 1:93–CV–299–JTC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Mar. 21, 1994.

---

Martin J. Elgison, John Kirk Train, III, Michael P. Kenny, Alston & Bird, John R. Lowery, Jane F. Thorpe, Pursley, Howell, Lowery & Meeks, Atlanta, GA, for plaintiff.

Chilton Varner, King & Spalding, Atlanta, GA, Kenneth A. Gallo, Edward Han, Keith E. Pugh, Jr., Howrey & Simon, Washington, DC, for defendant.

## ORDER OF THE COURT

CAMP, District Judge.

This is a complex antitrust case consisting of Plaintiff's eighteen count Complaint and Defendant's eleven counterclaims. The matter is presently before the Court on Defendant Siemens Medical Systems, Inc.'s ("SMS") Motion for Summary Judgment [# 139]; Plaintiff Servicetrends, Inc.'s ("Servicetrends") Motion for Summary Judgment on Counterclaims [# 147]; and Plaintiff's Motion to Add Defendants [# 50]. For the following reasons, Defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part. Plaintiff's motion for summary judgment on Defendant's counterclaims is **GRANTED**. Plaintiff's motion to add Defendants is **DENIED**.

## TABLE OF CONTENTS

| | | |
|-------|--------------------------------------------------------|------|
| I. | Background | 1049 |
| II. | Summary Judgment Standard | 1050 |
| III. | Defendant's Motion for Summary Judgment | 1051 |
| A. | Monopolization and Attempted Monopolization | 1051 |
| 1. | The Evils of Monopoly Power | 1052 |
| 2. | The Relevant Product Markets | 1054 |
| 3. | Monopolistic Conduct | 1054 |
| (a) | The Essential Facilities Doctrine | 1055 |
| (b) | Monopoly Leveraging | 1057 |
| (c) | Price Discrimination | 1057 |
| 4. | Conclusion | 1059 |
| B. | Tying Arrangements | 1059 |
| C. | Predatory Pricing Claims | 1062 |
| D. | Exclusive Dealing & Concerted Refusal to Deal | 1064 |
| 1. | Exclusive Dealing | 1064 |
| 2. | Concerted Refusal to Deal | 1066 |
| E. | Disparagement and Tortious Interference | 1067 |
| 1. | The Legal Effect of Disparagement | 1067 |
| 2. | Tortious Interference | 1068 |
| F. | Damages | 1069 |
| IV. | Plaintiff's Motion for Judgment on Counterclaims | 1069 |
| A. | Supplemental Facts and Analysis | 1069 |
| 1. | Geographic Market | 1069 |
| 2. | Product Market | 1070 |
| 3. | Market Power | 1070 |
| 4. | Antitrust Injury | 1071 |
| B. | Defendant's Antitrust Counterclaims | 1071 |
| 1. | Section 7 of the Clayton Act | 1071 |
| 2. | Conspiracy to Monopolize | 1072 |
| 3. | Monopolization and Attempt | 1072 |
| C. | Defendant's Business Tort Counterclaims | 1073 |
| 1. | Disparagement & Unfair Trade Practices | 1073 |
| 2. | Misappropriation of Confidential Info. | 1073 |
| 3. | Tortious Interference | 1074 |
| 4. | Unjust Enrichment | 1076 |
| V. | Plaintiff's Motion to Add Defendants | 1076 |
| VI. | Summary | 1076 |

---

## I. BACKGROUND

Siemens Medical Systems, Inc. is the American subsidiary of the German conglomerate Siemens Aktiengesellschaft ("Siemens AG"). Siemens AG manufactures the "Lithostar," a non-invasive medical device known as a lithotripter, which dissolves kidney stones by projecting high energy shock waves into the human body. The Lithostar is one of several brands of lithotripters available from different manufacturers. The Lithostar costs about $1.5 million, is durable

and long lasting, but requires frequent maintenance and periodic replacement of parts. Defendant SMS is the exclusive distributor of the Lithostar in the United States, providing sales, service and maintenance contracts after installation. Of the total 378 lithotripters currently in use in this country, 80 are Siemens Lithostars. SMS has contracts with equipment owners to service 67 or 68 Lithostars, amounting to about 85% of the total number of installed Lithostars but only 18% of the total lithotripters in the U.S.

Plaintiff Servicetrends is an independent service company incorporated in July, 1992, to provide maintenance for lithotripters. The company's sole business is servicing the Siemens Lithostar and its competitors, such as the Dornier HM–3.[1] Servicetrends does not operate lithotripters for patient treatment. To date, Servicetrends has secured service contracts on 12 or 13 Lithostars, approximately 16% of the potential Lithostar service contracts available in the United States. Servicetrends also has 27 contracts to service the Dornier HM–3.

The Lithostar is composed of numerous parts, among them the shocktube, the spark gap, and the shockwave generator. Plaintiff labels these "replacement parts." Replacement parts are modular units made up of several components. Siemens AG is Defendant's sole source of replacement parts, and Defendant is the sole distributor of Lithostar brand replacement parts in the United States. SMS provides replacement parts to its own service personnel for use in servicing equipment, and sells the same replacement parts to equipment owners and independent service organizations, including Servicetrends. SMS services Lithostars at the modular replacement part level only and does not sell or service the individual components that make up the replacement parts.

Although Lithostar parts are not interchangeable with parts produced by other lithotripter manufacturers, components made by independent manufacturers ("OEM's") can be purchased separately and used to repair the Lithostar without buying Siemens' modular replacement parts. For example, Servicetrends buys the spark gap and the shockwave generator components from OEM's and uses these components to service a customer's Lithostar on site. However, Servicetrends can buy the shocktube replacement part only in its modular form and only from SMS.[2]

· Plaintiff says that SMS forces Lithostar buyers to use SMS parts and repair services, thereby precluding Servicetrends from competing in the market for replacement parts and service contracts. In an extensive eighteen count complaint, Servicetrends alleges a wide variety of antitrust and business tort claims. Servicetrends contends that SMS engages in illegal tying arrangements, monopolization and attempted monopolization of markets for service and parts for lithotripters and Lithostars, exclusive dealing, concerted refusal to deal, violations of the Lanham Act and the Georgia Unfair Trade Practices Act, and tortious interference. Plaintiff seeks relief as provided under the Sherman and Clayton Acts—treble damages, injunctive relief, and attorneys' fees.

## II. SUMMARY JUDGMENT STANDARD ·

Rule 56(c), Fed.R.Civ.P., defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." The general rule of summary judgment in the Eleventh Circuit

---

1. The HM–3, manufactured by Dornier Medical Systems, received premarket approval from the FDA in 1984 and was the only lithotripter approved for sale in this country until 1988. Approximately 197 HM–3's were sold in the United States. Dornier ceased producing the HM–3 in 1987, with the advent of competing "second-generation" lithotripters using improved technology. In 1988, the FDA approved two new lithotripter manufacturers, Medstone and Siemens, and in 1991 Dornier received approval to sell its

own second-generation lithotripter, the MFL 5000.

2. The shocktube replacement part contains three components: a lens, a coil, and a membrane. Siemens does not sell these components, only the modular part itself. However, Siemens AG manufacturers the components, and Servicetrends claims it is unable to obtain them from any other source.

states that the moving party must show the court that no genuine issue of material fact should be decided at trial. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir.1991). "[U]nless the movant for summary judgment meets its burden under Rule 56, the obligation of the opposing party does not arise even if no opposing evidentiary material is presented by the party opposing the motion." *Id.*

 While all evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party, *Rollins v. Tech-South, Inc.,* 833 F.2d 1525, 1529 (11th Cir. 1987); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 249, 106 S.Ct. at 2511. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. at 2510.

 Where neither party can prove either the affirmative or the negative of an essential element of a claim, the movant meets its burden on summary judgment by showing that the opposing party will not be able to meet its burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In *Celotex,* the Supreme Court interpreted Rule 56(c) to require the moving party to demonstrate that the nonmoving party lacks evidence to support an essential element of its claim. Thus, the movant's burden is "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

 In either situation, only when the movant meets this burden, does the burden shift to the opposing party, who must then present evidence to establish the existence of a material issue of fact. *Id.* The nonmoving party must go beyond the pleadings and submit evidence in the form of affidavits, depositions, admissions and the like, to demonstrate that a genuine issue of material fact does exist. *Id.*

 Although some courts disfavor the use of summary procedures in complex antitrust cases, recent Supreme Court decisions have made it clear that summary judgment is appropriate in antitrust actions where the plaintiff fails to establish genuine issues of material fact bearing on the elements of the case. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SMS divides Plaintiff's eighteen counts into six groups and addresses them in "descending order of dispositive significance." To assist in organizing and reviewing the extensive record, the Court will follow the same format.

### A. MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION CLAIMS

Seven counts of Plaintiff's complaint deal with allegations of monopoly and attempted monopoly:

Count 5: Monopolization of the market for lithotripter and Lithostar service.

Count 6: Monopolization of the market for lithotripter and Lithostar service based on a refusal to deal.

Count 8: Attempted monopolization of the market for lithotripter and Lithostar service.

Count 9: Attempted monopolization of the market for lithotripter and Lithostar service based on leveraging.

Count 10: Attempted monopolization of the market for lithotripter and Lithostar service based on a refusal to deal.

Count 12: Monopolization of the market for lithotripter and Lithostar replacement and component parts.

Count 13: Attempted monopolization of the market for lithotripter and Lithostar replacement and component parts.

### 1. The Evils of Monopoly Power

■ Section 2 of the Sherman Act prohibits monopolization, attempts to monopolize, and conspiracy to monopolize.[3] In *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), the Supreme Court offered what has become the standard definition of an illegal monopoly:

> The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

Thus, the threshold issue is whether the Defendant has monopoly, or market, power. The second requirement, often called monopoly conduct, contemplates bad acts intended to eliminate competition by means unrelated to competitive merit.

■ Simply put, monopoly or market power is "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956); *American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1581 (11th Cir.1985). The existence of monopoly power can be inferred from a firm's dominant share of the market.[4] *Grinnell*, 384 U.S. at 570, 86 S.Ct. at 1704. The key to determining market share as a proxy for monopoly power is to define the relevant product and geographic markets. *See T. Harris Young & Assoc., Inc. v. Marquette Electronics*, 931 F.2d 816, 823 (11th Cir.1991). The parties agree for purposes of deciding Defendant's motion that the appropriate geographic market is the United States.

■ Defining the relevant product market is essentially a factual question. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir.1993). The Eleventh Circuit describes the procedure as follows:

> "Defining a relevant product market is primarily 'a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.'" The reasonable interchangeability of use or the cross-elasticity of demand between a product and its substitutes constitutes the outer boundaries of a product market for antitrust purposes.

---

3. Section 2 provides:

 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....

 15 U.S.C. § 2.

4. Market power is the measure of a firm's ability to raise prices above competitive levels without losing profits from decreased sales. The economic evil of monopoly power is simply the threat that a firm with excessive market share will charge more than a competitive price for the monopolized product.

 Because the actual data needed to prove monopoly pricing is rarely available, courts typically use "market share" as a convenient proxy. A firm's market share is the percentage of its unit sales to total market sales. Judge Hand originated the classic guidelines of market share sufficient to constitute monopoly power—90% market share constitutes a monopoly, 64% is "doubtful," and 33% is not enough. *See United States v.*

*Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir.1945); *see also Grinnell*, 384 U.S. at 570, 86 S.Ct. at 1704 (80% market share is a "substantial monopoly"; 87% "leaves no doubt" of monopoly power; and agreeing Judge Hand's 90% "constituted monopoly power") (citations omitted). The Second Circuit explained: "Sometimes, but not inevitably, it will be useful to suggest that a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power." *Broadway Delivery Corp. v. United Parcel Serv.*, 651 F.2d 122, 129 (2d Cir. 1981). Where the record showed that a defendant exercised market share of only 21%–27% in one market and 16% in another, the Fifth Circuit concluded that "market shares in the range of 16 to 25 percent ... are insufficient—at least absent other compelling structural evidence—as a matter of law to support monopolization." *Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 529 (5th Cir.1982).

*Id.* at 995 (citations omitted) (footnote omitted). Cross-elasticity of demand is a measure of the substitutability of products from a consumer's perspective.[5] Simply stated, the relevant product market consists of a specific product and its reasonable substitutes.

■■■ The second element of the monopolization offense, monopoly conduct, is more difficult to describe. In addition to the predatory pricing practices described in Part C. below, monopolistic conduct can sometimes be found where a seller refuses to supply a competitor with a product essential to the competitor's survival. This idea that antitrust liability can arise from a monopolist's "refusal to deal" dates back to an early Supreme Court case, *United States v. Terminal R.R. Ass'n*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912). In *Terminal Railroad*, a group of railroad companies gained control of a local cargo terminal and a toll bridge crossing the Mississippi River. The horizontal combination then used its control of this "essential facility" to discriminate against competitors and to profit on their own rail services. The Supreme Court held that the group's conduct violated §§ 1 and 2 of the Sherman Act, and ordered that other railroads depending on the facilities be allowed to participate in ownership and control. *See also Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (news information agency operating as a joint venture required to admit nonmembers on nondiscriminatory terms); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (public utility cannot refuse to wholesale power to smaller distribution systems).

The "essential facilities" doctrine underlay a recent "refusal to deal" case, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). Plaintiff "Highlands" operated a mountain ski area and joined with its larger competitor "Skiing Co." to offer vacationers a combined "all-Aspen" ski ticket. The package permitted skiers to use any of the four ski areas in Aspen and the two companies divided the revenues on the basis of relative use. Skiing Co. later decided to continue offering the combined pass only if the smaller Highlands would accept a fixed percentage of the revenues. Highlands refused and the all-Aspen ticket was discontinued. Highlands then charged Skiing Co. with monopolization based on its refusal to continue offering the combined ski package.

The Supreme Court noted that "even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor." *Id.* at 600, 105 S.Ct. at 2856. However, "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Id.* The Court indicated that a lack of valid business justifications for the refusal to cooperate, and a change in business policy that did not create a gain in efficiency, was enough to uphold the monopolization verdict for Plaintiff Highlands. *Id.* at 605–11, 105 S.Ct. at 2859–61.

■■■ Finally, there are three essential elements to a claim alleging attempted monopolization: (1) the specific intent to achieve monopoly power by predatory or exclusionary conduct; (2) actual anticompetitive conduct; and (3) a "dangerous probability of success" in defendant's attempt to achieve monopoly power. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 993 (11th Cir. 1993).

The intent element requires an intent to "destroy competition or build monopoly." *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). In many cases, intent can be inferred from the defendant's conduct,

---

5. The concept of cross-elasticity of demand is critical to determining which products are included in the total market from which a producer's market share is determined. When the price of a product rises above a competitive level, consumers seek to substitute products that are reasonably interchangeable. The relevant product market therefore includes competing products. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir.1993). A defendant's share of the total product market is calculated as its unit sales divided by the total unit sales of all the firms producing the same, or reasonably similar, products. Failing to consider reasonably substitutable products in the market share calculation understates the size of the total market and overstates the market power of the defendant.

essentially reducing the analysis to two elements. *See Spectrum Sports, Inc. v. McQuillan,* — U.S. —, —, 113 S.Ct. 884, 892, 122 L.Ed.2d 247 (1993) (unfair and predatory tactics may be sufficient to prove the necessary intent to monopolize); *see also McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1503–04 (11th Cir.1988) (evidence of predatory conduct may support an inference of intent to monopolize).

Anticompetitive conduct often cannot be evaluated independently of the "dangerous probability" of a firm's acquiring monopoly power. Competitive behavior by a small firm with little market share may become anticompetitive conduct when committed by a company with dominant market power. "To have a dangerous probability of successfully monopolizing a market the defendant must be close to achieving monopoly power." *U.S. Anchor,* 7 F.3d at 994. Thus, proving a dangerous probability of success first involves defining the relevant market and measuring market share as a proxy for monopoly power.

### 2. *The Relevant Product Markets*

█ Plaintiff presents evidence that there are three relevant product markets in this case: (1) the market for second-generation lithotripters; (2) the market for Lithostar parts; and (3) the market for Lithostar service contracts. Deposition of Roger Noll, pp. 10, 40–42, attached as Exhibit 10 to Plaintiff's Memorandum in Opposition [# 153]. However, the Complaint also alleges monopolization and attempted monopolization of an alleged market for *all* lithotripter parts and service. Defendant points out that Plaintiff's expert testified that there is no market for all lithotripters—not for sales, service or for replacement parts. Noll Depo., Defendant's Exh. 1, pp. 74–77. Indeed, Plaintiff apparently no longer asserts the existence of a product market for all lithotripters. Having presented no evidence on the matter, the Court concludes that Plaintiff cannot meet its burden of proving the existence of monopoly power, or the dan-

gerous probability that Defendant will achieve monopoly power, in the alleged market for all lithotripters. Accordingly, the Court **GRANTS** Defendant summary judgment with respect to Plaintiff's claims of monopolization and attempted monopolization of a product market consisting of all lithotripters.[6]

Plaintiff contends that SMS possesses monopoly power in each of the three product markets it describes. First, SMS dominates the market for sales of second-generation lithotripters with an 80% share of total market sales for the period October, 1989 through August, 1993. Second, SMS' share of the Lithostar parts market was 100% until the formation of Servicetrends in 1992, and remains very substantial today. Finally, prior to Servicetrends' entry, SMS held 94% of the market for Lithostar service. During the period October, 1991 through September, 1992, 79% of all Lithostar sites were under maintenance contract with SMS, and the balance were either covered by warranty or serviced on a time and materials basis. In 1993, SMS serviced 70 of the 80 Lithostars in operation.

For purposes of its summary judgment motion, SMS does not contest Plaintiff's characterization of the three relevant product markets or Defendant's monopoly power therein. The Court's factual inquiry into defining the relevant product market, in order to determine whether Plaintiff has established the first element of a monopolization claim, can therefore be decided on the basis of Plaintiff's evidence alone.

### 3. *Monopolistic Conduct*

The second element of Plaintiff's monopolization and attempt claims requires proof of anticompetitive conduct. Servicetrends alleges that SMS engages in anticompetitive conduct in three distinct ways: (a) violation of the "essential facilities" doctrine; (b) monopoly leveraging; and (c) price discrimination.

---

**6.** Because Defendant has supported its motion for summary judgment with affirmative evidence demonstrating that Plaintiff will be unable to prove an element of the claims pertaining to a market for all lithotripters, the Court need not address Defendant's contention that Siemens' 18% market share is insufficient as a matter of law to establish market power or a dangerous probability of success.

### (a) The "Essential Facilities" Doctrine

■ The essential facilities doctrine makes it illegal for the holder of an "essential facility" to deny access to a competitor where there is no legitimate business reason for the refusal. *See generally City of Anaheim v. Southern Cal. Edison Co.*, 955 F.2d 1373, 1379–80 (9th Cir.1992). Although the doctrine originated in the context of a concerted refusal to deal, *see United States v. Terminal R.R. Ass'n*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), more recent formulations by lower courts have broadened its application. In this case, Plaintiff seeks to apply the doctrine by arguing that Siemens AG's patents on the shocktube and its component parts create a "legal monopoly" that enables it's subsidiary SMS to price discriminate, to raise entry barriers to the Lithostar service market, and to leverage its parts monopoly into the market for Lithostar service.

■ To establish a violation of the essential facilities doctrine, Servicetrends must prove four elements:

> (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.

*MCI Communications Corp. v. AT & T*, 708 F.2d 1081, 1132–33 (7th Cir.1983). Plaintiff must also demonstrate that, by denying access to an essential facility, defendant caused it "severe handicap" amounting to "more than inconvenience, or even some economic loss." *See Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 569–70 (2d Cir.1990).

■ The undisputed facts show that Siemens AG owns U.S. patents Nos. 4,697,588 and 4,878,488, covering the shocktube replacement part and its components. Jay Affidavit, Defendant's Exh. 63; Rattner Affidavit, Defendant's Exh. 64. Under the patent laws, Siemens AG has a seventeen-year "monopoly" on the right to manufacture, sell or license the patented device. *See* 35 U.S.C. §§ 101, 154, 271(d)(4). Pursuant to these rights, Siemens AG appointed its American subsidiary SMS as the exclusive distributor of the shocktube replacement part in the United States.

Defendant SMS employs a "shocktube refund policy" to distribute the patented device. When a Lithostar shocktube needs replacing, Defendant's customers return the old unit to SMS and pay the "exchange price" for a new unit. This exchange price is substantially lower than the "list price," or what a buyer would pay without trading in a used part. SMS then sends the old unit to Siemens AG for remanufacture. If Siemens AG determines that the old part is refurbishable, it sends SMS a credit for the value of the used part. In effect, by charging a discounted price for a new shocktube in exchange for the old repairable unit, SMS is advancing to its service contract customers the credit it later receives from its parent.

Servicetrends buys shocktubes from SMS at the same nominal price as other customers, but SMS does not advance to Servicetrends the offsetting trade-in credit until Siemens AG examines the used device and issues a refund. Consequently, Servicetrends bears the cost of funds for the difference between the list price and the exchange price during the interim period. *See* Rankin Depo., Defendant's Exh. 7, pp. 80–81; Christensen Depo., Defendant's Exh. 8, p. 138; DeBrock Depo., Plaintiff's Exh. 8, p. 324; Warlick Depo., Plaintiff's Exh. 13, p. 282.

Servicetrends argues that the shocktube return policy is an exclusionary tactic not justified by SMS' patent rights. "[W]hen SMS *sells* a Lithostar shocktube, SMS in effect forces every purchaser of a shocktube including Servicetrends to send its shocktube to Siemens AG in Germany for repair. This conduct is anti-competitive and a barrier to entry into the separate Lithostar service market." Plaintiff's Memorandum in Opposition [# 155], p. 29.

Plaintiff cites no authority to support its assertion that Defendant's refund policy constitutes anticompetitive conduct. To the contrary, as a competitor, Servicetrends is not by right entitled to enjoy the "free ride" that SMS provides in the form of inventory financing for its own customers. *See, e.g., Abcor Corp. v. AM Int'l Inc.*, 916 F.2d 924, 929–30 (4th Cir.1990) (no anticompetitive

conduct where parts manufacturer shifted inventory carrying cost to competing dealer while continuing to service own customers).

In addition, Defendant SMS maintains that the shocktube refund policy has no anticompetitive effect and produces no significant economic loss for Servicetrends. According to Defendant, the increased cost of funds to Servicetrends amounts to approximately one percent of revenues.[7] *See* Shapiro Depo., Defendant's Exh. 60, p. 127. Plaintiff's own antitrust expert says a level of 5% of revenues would indicate a significant adverse effect on Servicetrends. Noll Depo., Plaintiff's Exh. 1, p. 127. Thus, Plaintiff has produced no facts showing a competitive injury or that it suffered a significant economic loss as a result of Defendant's shocktube return policy.

Servicetrends does not explain exactly how the "essential facilities" doctrine applies to the facts in this case. Since Plaintiff's own evidence proves that SMS does not deny Servicetrends use of the patented shocktube replacement part, the Court concludes that Plaintiff's essential facilities attack is focused on Defendant's refusal to sell the shocktube's patented component parts. Certainly, the inability to purchase the unit's component parts may deprive Servicetrends of the opportunity to repair a customer's shocktube on site. Instead, the shocktube refund policy compels Plaintiff to return the worn out assembly to the manufacturer and to purchase an entire shocktube for reinstallation. Noting that Defendant's patent permits it to sell the shocktube for a "monopoly price," Servicetrends complains that "[t]he claimed patent, however, does not give SMS the exclusive right to repair the shocktube." Plaintiff's Memorandum in Opposition [# 155], p. 28.

■ As a general proposition, Siemens AG's lawful patent does give it the right to refuse to sell or license the patented device, including the component parts of the shocktube. *See, e.g., SCM Corp. v. Xerox Corp.,* 645 F.2d 1195, 1204 (2d Cir.1981). "No court has ever held that the antitrust

laws require a patent holder to forfeit the exclusionary power inherent in his patent the instant his patent monopoly affords him monopoly power over a relevant product market." *Id.* Although certain forms of patent abuse may give rise to antitrust liability, *see, e.g., Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), "where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger any liability under the antitrust laws." *SCM Corp.,* 645 F.2d at 1206. In the absence of authority to the contrary, the Court finds that SMS has no legal obligation to sell patented component parts to its competitor Servicetrends.

Thus, Plaintiff is likely mistaken in its assertion that Defendant does not have the exclusive right to repair the modular shocktube. Although the Court need not decide the issue here, it appears that Defendant is entitled to a so-called monopoly in the repair of its shocktube replacement part—a monopoly power that is inherent in its right to sell or refuse to sell the patented components.

■ Plaintiff and Defendant have access to the same "facility." Siemens AG does not supply the individual shocktube components to its subsidiary SMS for use in servicing customers' equipment. Instead, SMS and Servicetrends compete on equal footing in the Lithostar service market. Both have access to the shocktube replacement part and, in addition, Servicetrends purchases components of the spark gap and shockwave generator from other independent OEM's. DeBrock Depo., Defendant's Exh. 6, pp. 359–78. *See Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.,* 924 F.2d 539, 544–45 (4th Cir. 1991) (affirming summary judgment where plaintiff "failed to show that it could not reasonably duplicate or pursue a reasonable alternative to the essential facility"). Servicetrends has captured thirteen Lithostar service customers from SMS since mid–1992, and reportedly earned $1 million in operating profits in its first year. The evidence in this case simply does not support an inference

---

7. Plaintiff's damages expert, John Preston, testified that Servicetrends' interest cost resulting from Defendant's refund policy amounted to approximately $9,000, compared to service revenues of $2,141,506 for the same period. *See* Preston Depo., Defendant's Exh. 4, pp. 78–81.

that Servicetrends has been denied access to an essential facility, or that the shocktube components are essential to competition in the Lithostar service market.[8]

### (b) *Monopoly Leveraging*

 Servicetrends cites *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir.1979), to advance the proposition that a monopolist violates § 2 by using its monopoly power in one market to gain a competitive advantage in another market. Plaintiff contends that the list price versus exchange price differential and the credit policy incorporated into Defendant's shocktube refund program are examples of monopoly leveraging in the parts market designed to gain an advantage in the service market. Servicetrends also points to Defendant's refusal to sell shocktube components as another example of leveraging:

"In addition to the return policy, SMS also insures its ability to leverage its monopoly power in the 'patented' shocktube into the separate Lithostar service market by refusing to sell or make available components of the shocktube, effectively thwarting any effort to repair. The effect is that SMS not only has monopoly control and power in the parts market, but also gains and maintains monopoly control and power in the separate Lithostar service market.

Plaintiff's Memorandum in Opposition [# 155], p. 30 (citation omitted).

These claims are essentially identical to those already addressed. The Court has determined that neither the shocktube refund policy nor Defendant's refusal to sell patented component parts offends antitrust law. Moreover, it is not the per se use of leverage that the *Berkey Photo* court condemned, but the anticompetitive conduct accompanying

such use. In the absence of bad behavior, i.e., "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor," *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948), the court endorsed an expansive vision of legitimate monopoly conduct:

[A] large firm does not violate § 2 simply by reaping the competitive rewards attributable to its efficient size, nor does an integrated business offend the Sherman Act whenever one of its departments benefits from association with a division possessing a monopoly in its own market. So long as we allow a firm to compete in several fields, we must expect it to seek the competitive advantages of its broad based activity....

*Berkey Photo*, 603 F.2d at 276. In the absence of a showing that Defendant's conduct falls outside the scope of competition on the merits, Plaintiff cannot succeed in proving its monopolization and attempt claims.

### (c) *Price Discrimination*

 Servicetrends contends that SMS engages in anticompetitive conduct through price discrimination in two ways. First, Defendant's pricing and exchange policies for the shocktube replacement part allegedly "are anti-competitive; are a result of monopoly leveraging; create a 'price squeeze' on Servicetrends; constitute illegal price discrimination; raise barriers to entry into the service and parts markets; and have caused antitrust injury." Plaintiff's Memorandum in Opposition [# 155], p. 19. Second, Plaintiff contends that Defendant engages in illegal price discrimination with Med–Lab Supply Company ("Med–Lab").[9]

---

**8.** Defendant offers a number of business justifications for its allegedly monopolistic conduct. Although legitimate business reasons can serve as a defense for a monopolist's exclusionary acts and refusal to deal, *see, e.g., Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 368–69 (9th Cir.1988) (and cases cited therein), "[w]hether valid business reasons motivated a monopolist's conduct is a question of fact." *High Technology Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir.1993) (citing *Eastman Kodak Co. v. Images Technical Serv., Inc.*, ── U.S. ──, ──, 112 S.Ct. 2072, 2091,

119 L.Ed.2d 265 (1992)). However, having determined that SMS is not required to sell the patented shocktube components as a matter of law, this Court need not decide whether factual questions precluding summary judgment exist regarding the validity of Defendant's asserted justifications.

**9.** Plaintiff does not suggest that its price discrimination charge implicates either the Robinson–Patman Act (amending § 2 of the Clayton Act) or antitrust restrictions against resale price mainte-

Viewing all evidence and factual inferences in a light most favorable to Plaintiff, the following facts emerge as undisputed. Med–Lab is an authorized service agent for SMS in the Miami area. Noll Depo., Plaintiff's Exh. 10, pp. 176–89. By the terms of a Representation Agreement signed in June, 1989, Med–Lab acts as SMS' sales agent for Siemens' products, installs equipment, pays its own expenses to attend Siemens' training sessions, provides monthly reports and customer training, performs warranty service at its own expense, and assists SMS to meet local regulatory obligations. Representation Agreement, attached as Exh. 89 to Rankin Depo., Plaintiff's Exh. 3. In exchange for performing these marketing functions, Med–Lab receives a 25% discount on parts. Agreement, cover letter; Rankin Depo., p. 387.

The Representation Agreement prohibits SMS from soliciting sales orders or service business in Med–Lab's assigned territory, unless the customer demands SMS. Agreement, p. 8, ¶ 11. Thus, Med–Lab and SMS generally do not compete within the authorized area. Med–Lab does compete with Plaintiff Servicetrends in the area's Lithostar parts and service markets. Further, Med–Lab is not permitted to resell Siemens' products to customers at prices lower than those quoted by SMS in the agreed territory. Agreement, p. 3, ¶ 3(m).

Plaintiff cites *Aspen Skiing* and *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), as authority for the legal assertion that SMS' discount price for parts sold to Med–Lab evidences

anticompetitive conduct. As discussed above, *Aspen Skiing* involved the termination of a joint marketing agreement in an essential facilities context. *Lorain Journal* concerned a newspaper that attempted to monopolize the sale of advertising by refusing to deal with local advertisers who purchased radio ads. These cases do not address the issue of price discounts provided to selected distributors and they are not pertinent here.

Defendant raises *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), to validate its contention that the 25% parts discount compensates Med–Lab for services and expenditures that benefit SMS. In dictum, the *Monsanto* Court noted that "[t]he manufacturer often will want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesmen or demonstrating the technical features of the product, and will want to see that 'free-riders' do not interfere." *Id.* at 762–63, 104 S.Ct. at 1470. This desire, however, does not legitimize every discount program a manufacturer may institute to ensure distributor profits.

Cases challenging unlawful price discrimination practices under the Robinson–Patman Act are instructive in assessing the possible anticompetitive implications of Defendant's discount price arrangement with Med–Lab.[10] In *Texaco Inc. v. Hasbrouck,* 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990), the Court reviewed the role of "functional discounts" granted to distributors as reimbursement for the value of their market-

nance agreements, ruled a per se violation of the Sherman Act by *Dr. Miles* and progeny. *See Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). Instead, Plaintiff argues that the price discount provided to Med–Lab and not to Servicetrends is a form of anticompetitive conduct. *See* Plaintiff's Memorandum in Opposition [# 155], pp. 23–26. Therefore, the Court specifically restricts its review to the Med–Lab Representation Agreement to the narrow issue of whether Plaintiff's practice of extending a price discount to Med–Lab is anticompetitive.

**10.** Section 2(a) of the Robinson–Patman Act makes it illegal for a seller to discriminate in price between customers. "Price discrimination" in this context means "price difference."

A seller discriminates whenever the difference in price charged to customers does not reflect a difference in the marginal cost of selling to them. However, the statute does not ban all price differences charged to different customers. Instead, the statute provides a number of important limitations, including a defense permitting price discrimination based on differences in costs: "nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities ... [sold]." 15 U.S.C. § 13(a). *See, e.g., Brook Group Ltd. v. Brown & Williamson Tobacco Corp.,* —— U.S. ——, ——, 113 S.Ct. 2578, 2586, 125 L.Ed.2d 168 (1993).

ing functions. "Such a discount is not illegal." *Id.* at 562, 110 S.Ct. at 2546; *see also Americom Distrib. Corp. v. ACS Communications, Inc.*, 990 F.2d 223, 227 (5th Cir.1993) ("The Act allows a price differential due to savings in costs of manufacture, delivery, or sale."). However, distributor discounts that are "completely untethered" to the manufacturer's marginal cost savings, or merely "subterfuges to avoid the Act's restrictions," violate prohibitions against price discrimination. "Only to the extent that a buyer actually performs certain functions, assuming all the risks and costs involved, should he qualify for a compensating discount. The amount of the discount should be reasonably related to the expenses assumed by the buyer." *Id.* 496 U.S. at 564, 110 S.Ct. at 2547 (quoting *In re Doubleday & Co.*, 52 F.T.C. 169, 209 (1955)). The burden of proof is on the plaintiff to show that functional discounts constitute illegal price discrimination. *Id.* at 560 & n. 18, 110 S.Ct. at 2545 & n. 18.

Uncontroverted facts show that Med–Lab provides marketing functions for SMS which Servicetrends does not perform. Plaintiff offers no evidence from which a juror might reasonably conclude that the discount does not fairly reflect the value of Med–Lab's marketing services. To the contrary, the evidence indicates that Med–Lab provides at its own expense substantial sales and support functions. In the complete absence of evidence from which an injury to competition might be inferred, the Court concludes that Defendant's conduct with respect to the Med–Lab parts discount is not anticompetitive.

#### 4. *Conclusion*

The Court finds that there is no genuine dispute of material fact pertaining to the monopolization and attempt claims in Counts 6, 9, 10, 12, and 13. Having found no evidence of anticompetitive conduct in product markets where Defendant admits to possessing monopoly power, the Court hereby GRANTS Defendant summary judgment on Counts 6, 9, 10, 12, and 13. As discussed below in Part C., the Court DENIES summary judgment on Counts 5 and 8 insofar as they are based on predatory pricing theory.

### B. *TYING ARRANGEMENTS*

Plaintiff's Complaint contains four counts founded on assertions of illegal tying arrangements:

Count 1: Tying the sale of Lithostar service to the sale of Lithostar replacement parts.

Count 2: Tying the sale of the modular replacement parts to the purchase of components.

Count 3: Tying the sale of Lithostar service to the sale of the Lithostar lithotripter.

Count 4: Tying the sale of service to the sale of financing for the Lithostar lithotripter and other lithotripters.

■■■ A tying arrangement conditions the sale of one product on the purchase of another. *See Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The product the purchaser wants to buy is known as the "tying product," while the unwanted but attached product is the "tied product." The essential antitrust concern regarding tying is that the illegal arrangements foreclose competing manufacturers from selling in the tied product market.[11] Tying the sale of goods is expressly prohibited by § 3 of the Clayton Act, 15 U.S.C. § 14. Section 1 of the Sherman Act prohibits tying involving goods or

---

11. Tying arrangements are nominally regarded as per se illegal, but the law has undergone substantial changes in recent years and modern tying cases indicate that tying may be subject to a "rule of reason" balancing approach. *See, e.g., Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (four Justices favor removing tying from the per se category of antitrust offenses). This evolution in judicial thinking is based on a reevaluation of the economic theory associated with tying. Originally, tying was condemned because of a fear that a firm with monopoly power in the tying product market would be able to use that power as a lever into the tied product market. For example, a monopolistic seller of copy machines might be able to monopolize the paper market if it was allowed to tie the sale of copy paper to the sale of the machine. The leverage theory underpinning the per se treatment of tying has lost favor, however, as economists today generally concede that tying cannot transfer monopoly power from one market to another.

services. The standard for distinguishing a tying violation under the Sherman and Clayton Acts was addressed in *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), but the distinctions have blurred in the lower courts over the past forty years and are unimportant in this case. Plaintiff Servicetrends brings its tying complaints under the Sherman Act.[12]

■ An illegal tying arrangement under Section 1 has five elements: (1) two products, i.e., a tying and a tied product; (2) evidence of actual coercion by the seller that forced the buyer to purchase the tied product; (3) sufficient market power in the seller's tying product market to force the buyer to accept the tied product; (4) anticompetitive effects in the tied product market; and (5) involvement of a "not insubstantial" amount of interstate commerce in the tied product market. *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502–03 (11th Cir.1985) (citing *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56–57 (2d Cir.1980)).

■ Count 1 alleges that Defendant ties the sale of Lithostar service (the tied product) to the sale of three Lithostar replacement parts: the shocktube, the shockwave generator, and the spark gap (the tying products). Plaintiff's attack focuses on the shocktube, again arguing that the unavailability of separate component parts forces a customer to buy unwanted repair services in order to purchase a shocktube component.

Servicetrends' real complaint is that it must pay for Siemens AG's repairs of the modular shocktube replacement part because Siemens AG will not sell the shocktube components. However, this contention is different from the allegations contained in Count

1. Count 1 alleges a tie between the market for Lithostar service and the market for Lithostar replacement parts.[13] *See* Complaint, ¶ 75, 76. Plaintiff now seeks to reinterpret Count 1 to encompass a tie between service of the shocktube and the sale of shocktube components. Although Defendant admits to a product market for Lithostar service contracts, the record contains no evidence of a product market for shocktube service.

■ A tying claim requires evidence that the seller refuses to sell the tying product unless the buyer purchases the tied product: "Where there is no tie, there is no claim." *See T. Harris Young & Assoc., Inc. v. Marquette Elec., Inc.*, 931 F.2d 816, 821–22 & n. 10 (11th Cir.1991). The record is clear that SMS does not refuse to sell shocktubes, spark gaps, and shockwave generators to Servicetrends even though Servicetrends does not purchase Lithostar service. DeBrock Depo., Defendant's Exh. 6, p. 449; Noll Depo., Defendant's Exh. 1, p. 271 ("I am not aware of a tie between parts and service"). The Court finds no evidence of a tie between Lithostar replacement parts and Lithostar service and no basis in fact or in law to sustain Plaintiff's Count 1.

■ Count 2 alleges that purchasers of Lithostar component parts (the tying product) are forced to purchase the entire modular replacement part (the tied product). Complaint, ¶ 82. However, "a tying arrangement cannot exist unless two separate product markets have been linked." *Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 21, 104 S.Ct. 1551, 1562–63, 80 L.Ed.2d 2 (1984). In this case, there is no evidence of a product market for Lithostar component parts.[14]

---

12. Section 1 does not mention "tying," but prohibits contracts in restraint of trade:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.
15 U.S.C. § 1.

13. Plaintiff states: "Count I of the Complaint alleges that SMS has illegally tied the sale of Lithostar replacement parts (the tying product) to the sale of Lithostar repair and service (the

tied product)." *Plaintiff's Memorandum in Opposition* [# 155], p. 45.

14. Plaintiff's expert Noll testified: "I thus far have seen no evidence that would support the notion that there's a separate market for each of those specific components that go into the shockhead." Defendant's Exh. 1, p. 77.

Similarly, Defendant's expert Shapiro testified that there is no separate relevant parts market in this case. Shapiro Depo., Defendant's Exh. 60, pp. 36–37.

Consequently, no illegal tie-in can exist and Plaintiff's Count 2 fails.

■ Count 3 alleges that Defendant ties the sale of Siemens Lithostars (the tying product) to the sale of Lithostar service (the tied product). Complaint, ¶ 89. Specifically, Plaintiff claims that SMS's inclusion of a one-year "warranty" in the Lithostar's purchase price constitutes an illegal tying arrangement.

The Court initially notes that Plaintiff offers no case authority suggesting that the Lithostar and its associated manufacturer's warranty constitute two separate products. *See Jefferson Parish,* 466 U.S. at 19–22, 104 S.Ct. at 1562–63. Defendant has never sold the one-year Lithostar warranty separately from the equipment. Christensen Depo., Defendant's Exh. 8, pp. 23–24. The warranty is not separately priced and its cost is included in the price of the Lithostar.

In *Jefferson Parish,* the Supreme Court considered whether a hospital's surgical and anesthesiological services should be regarded as two products for tying analysis purposes. The Court asked whether the two services could be meaningfully separated: "Thus, in this case no tying arrangement can exist unless there is a sufficient demand for the purchase of anesthesiological services separately from hospital services to identify a distinct product market in which it is efficient to offer [the services separately]." *Jefferson Parish,* 466 U.S. at 21–22, 104 S.Ct. at 1563.

The evidence in this case suggests that no separate demand exists for the purchase of a one year warranty; in fact, Lithostar purchasers view the provision of the manufacturer's warranty as essential to their decision to buy the machine. Buyers indicate that they would consider it "unusual if equipment of this nature came without some warranty." Dills Depo., Defendant's Exh. 55, p. 89. One

doctor said that if SMS offered no warranty on its $1.5 million Lithostar, "[w]e would not buy it." Puras–Baez Depo., Defendant's Exh. 34, p. 33. Thus, there is no indication of consumer demand for a one-year warranty provided by anyone other than the Lithostar's manufacturer, and no evidence that providing the warranty separately from the machine would be economically efficient. *See, e.g., Klo–Zik Co. v. General Motors Corp.,* 677 F.Supp. 499 (E.D.Tex.1987) (sale of truck engines with warranties included did not constitute an illegal tying arrangement).

Moreover, Defendant's Lithostar warranty lacks the necessary element of coercion. The *Jefferson Parish* Court referred to coercion as an independent prerequisite for a tying violation:

> Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.

*Jefferson Parish,* 466 U.S. at 12, 104 S.Ct. at 1558; *see also Response of Carolina, Inc. v. Leasco Response, Inc.,* 537 F.2d 1307, 1327 (5th Cir.1976) ("it must be shown that the purchaser was coerced into purchasing an unwanted product"). Plaintiff Servicetrends has made no showing of coercion pertaining to the one-year Lithostar warranty.[15] Thus, The Court concludes that Plaintiff has failed to come forward with specific facts demonstrating that a Lithostar and its manufacturer's warranty are two separate products whose markets are linked through coercive means. Count 3 therefore cannot withstand summary judgment.

Count 4 alleges an illegal tie between the manufacturer's equipment financing program (the tying product) and the service market (the tied product). Servicetrends admits to

15. Plaintiff points to Defendant's execution of an equipment Repurchase Agreement with the Endourological Institute of Puerto Rico as an example of an illegal tie between sales and service. The Agreement concerned a common financing requirement by an equipment lessor that the lessee-buyer designate a third party to assume the debt and remarket the equipment in the event of default. SMS, at the request of the buyer and the lender, agreed to repurchase the equipment if requested, but only if SMS performed the maintenance during the equipment's service life. This arrangement was made to facilitate financing of the equipment and lacks any indication of coercion.

**1062**

lacking sufficient evidence to support this claim and does not oppose the granting of summary judgment on Count 4.

In summary, the Court finds no material factual dispute concerning Plaintiff's tying claims and **GRANTS** Defendant summary judgment as a matter of law on Counts 1, 2, 3, and 4.

### C. *PREDATORY PRICING CLAIMS*

■■■ Defendant moves for summary judgment under Section 2 of the Sherman Act with respect to Counts 7 and 11, as well as Counts 5 and 8 insofar as they are based on predatory pricing theory:

Count 7: Predatory pricing in the market for Lithostar replacement parts.

Count 11: Predatory pricing in the markets for lithotripter service generally and for Lithostar service.

In Count 7, Plaintiff charges that SMS engaged in predatory pricing "for the purpose of maintaining its monopoly" in the Lithostar replacement parts market. Complaint, ¶ 114. Count 11 is an attempt to monopolize claim, accusing SMS of predatory pricing "with the intent of destroying competition" in the service markets. Complaint, ¶ 133. Counts 5 and 8, discussed in Part A. above, allege monopolization and attempted monopolization of the lithotripter and Lithostar service market. In this case, then, predatory pricing is relevant as proof of monopolistic conduct to establish an element of monopolization and attempted monopolization—it does not relieve Plaintiff of the burden of proving at trial that Defendant has monopoly power or a "dangerous probability of success."

■■■ Predatory pricing is a term of art that describes "pricing below an appropriate measure of cost for the purpose of eliminating competition in the short run and reducing competition in the long run." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 117, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986). A predator prices its product below profit maximizing levels with the expectation of charging monopoly prices in the future when competitors are driven from the market. Predatory pricing is generally analyzed as consti-

tuting the conduct portion of an attempt to monopolize, and since intent can be inferred from conduct, evidence of predatory pricing can support an inference of specific intent. One problem courts have encountered in applying predatory pricing theory is recognizing and distinguishing those instances of legitimate price cutting that epitomize the benefits of unrestrained competition.

In a case where Japanese manufacturers were accused of conspiring to charge predatory prices for televisions sold in the United States, the Supreme Court suggested that predatory pricing schemes are unlikely to succeed:

[T]he success of such schemes is inherently uncertain: the short-run loss is definite, but the long-run gain depends on successfully neutralizing the competition.... Absent some assurance that the hoped-for monopoly will materialize, *and* that it can be sustained for a significant period of time, "[t]he predator must make a substantial investment with no assurance that it will pay off." For this reason, there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986) (citations omitted). The Court further noted the danger of confusing a predatory pricing scheme with the beneficial effects of increased competition:

[C]utting prices in order to increase business often is the very essence of competition. Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect. "[W]e must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition."

*Id.* at 594, 106 S.Ct. at 1360 (citations omitted). Affirming summary judgment on plaintiff's predatory pricing claims, the Court specifically noted that its observations also applied to predatory pricing by a single firm seeking monopoly power. *Id.* at 588, 106 S.Ct. at 1357.

In *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487 (11th Cir.1988), this circuit established the test a district court must use in evaluating a defendant's motion for summary judgment in an antitrust claim based on predatory pricing: "[W]e hold that when an antitrust defendant moves for judgment as a matter of law, the test for predatory pricing must consider subjective evidence and should use average total cost as the cost above which no inference of predatory intent can be made." *Id.* at 1496 (footnote omitted). The court spelled out the elements of the test: "Average total cost means the average of the total economic cost, which includes the necessary minimum profit." *Id.* at 1503 (footnote omitted). If defendant's prices are above short run marginal cost, plaintiff must present other evidence of predatory intent, either objective or subjective. *Id.* "The closer a defendant's price is to average total cost, the stronger this other evidence must be for the plaintiff still to avoid summary judgment." *Id.* Prices below short run marginal cost create a rebuttable presumption of predatory intent. *Id.* at 1504.

In this case, Servicetrends originally based its predatory pricing claim on the assertion that SMS gave away "free" replacement parts to customers solicited by Servicetrends. Complaint, ¶ 64. Plaintiff did not submit an analysis of Defendant's cost structure to support its charge, but relied instead on the logical certainty that "free" must mean a price below any economic measure of production cost.

Servicetrends asserted that SMS provided free parts to three customers: Lithotripters, Inc.; St. Luke's Medical Center; and Clinicas Las Americas. *See* Plaintiff's Answers to Defendant's First Interrogatories, Defendant's Exh. 38, pp. 21–22. Defendant denied giving away free parts, explaining that the price of replacement parts is sometimes included in the total price of the service agreement. Defendant stated that it "has never sold replacement parts below cost to any of its customers, including Lithotripters, Inc., Clinicas Las Americas, and St. Luke's Medical Center." Defendant's Memorandum in Support [# 143], p. 4. According to SMS, its service contracts are fully priced "to cover costs of providing such parts and service and to allow for a reasonable profit." *Id.* To support its claim, Defendant offered the affidavit of Guenter Westermann, Senior Vice President responsible for pricing replacement parts, who testified: "Siemens Medical prices Lithostar replacement parts above its cost of purchasing those parts from Siemens AG.... such that it can recover its cost of buying those parts from Siemens AG and realize a reasonable rate of return." Westermann Affidavit, Defendant's Exh. 42, ¶ 4. Defendant also supplied testimony from each of the three named customers denying that SMS provided any parts for free. *See* McCumber Depo., Defendant's Exh. 45, p. 371; Puras–Baez Depo., Defendant's Exh. 34, p. 59; Schmidt Depo., Defendant's Exh. 37, p. 78.

Plaintiff subsequently abandoned its assertion that SMS distributed free parts to customers. Instead, Plaintiff now presents evidence that Defendant executed service contracts priced below its average total direct costs. Specifically, Servicetrends points to a 1988 SMS document that purports to calculate the "direct cost"[16] of a Lithostar service contract:

Parts:
Shock wave generator ...... $ 14,450
High voltage supply ........ $ 12,000
Other parts ................ $ 16,000
Subtotal—Parts ................ $ 42,450

---

**16.** In this context, "direct cost" refers to parts and labor costs only. Other cost allocations reflecting general and administrative expenses, plus the "necessary minimum profit" component mentioned in *McGahee*, must be added to derive a total average cost. Hence, this direct cost estimate is lower than a comparable total cost figure and strengthens Plaintiff's assertion of predatory intent. Also, these costs are stated in 1988 dollars, versus the revenue figures found in Defendant's 1992 service contracts. Inflation during the intervening four years tends to overstate the income from service contracts and narrow the real amount by which costs exceed revenues.

Labor ................................... $ 26,970

Subtotal—Parts & Labor .................. $ 69,420
Shock tube ............................. $ 53,750
Total service cost ....................... $123,170

---

*See* Rankin Depo., Plaintiff's Exh. 3, deposition exhibit 73.

In 1992, Defendant signed a service contract with Clinicas Las Americas for $68,335. *See* Service Agreement, Plaintiff's Exh. 28, marked Puras deposition exhibit 65. Defendant's District Service Manager, David Horgan, states that the contract price "excludes shock wave generating components, *i.e.*, the shockhead, the shock wave generator, and the spark gap." Horgan Affidavit, Defendant's Exh. 46, ¶ 3. If these parts were in fact excluded, the price of the service contract would exceed SMS' apparent direct cost. However, Mr. Horgan's letter to Dr. Puras–Baez specifically notes that shock-tubes are excluded, but the shockwave generator and spark gap is included in the price. *See* Horgan Letter, Plaintiff's Exh. 28, marked Puras deposition exhibit 64. Thus, the evidence suggests that Defendant sold a service contract costing more than $69,420 to perform for proceeds of $68,335.

Similarly, Plaintiff points to evidence that the direct cost of a service contract sold to St. Luke's Hospital was $93,690, compared to a sales price of $89,000. *See* Plaintiff's Memorandum in Opposition [# 155], pp. 71–72 and citations therein. In addition, Defendant allegedly sold twenty-six three-year service contracts to Lithotripters, Inc. for a price of $150,000 each, compared to an estimated direct cost of $174,315. *Id.* at 72–73. Plaintiff also presents a 1992 SMS report entitled "Lithotripter Service Analysis" to corroborate the cost figures found in the 1988 document.[17] *See* Messinger Analysis, Plaintiff's Exh. 7.

The Court concludes that Plaintiff has produced unrebutted evidence showing the existence of genuine issues of material fact concerning Defendant's alleged predatory pric-

ing policy. Accordingly, Defendant's motion for summary judgment on Counts 7 and 11, and on Counts 5 and 8 insofar as they are based on predatory pricing theory, is **DENIED.**

### D. *EXCLUSIVE DEALING and CONCERTED REFUSAL TO DEAL*

Counts 14 and 15 charge violations of Section 1 of the Sherman Act:

Count 14: Exclusive dealing between SMS and third parties for service of the Lithostar.

Count 15: Concerted refusal to deal based on agreements between SMS and third parties prohibiting use of Servicetrends for Lithostar service.

#### 1. *Exclusive Dealing*

Exclusive dealing arrangements are essentially requirements contracts, whereby the buyer agrees to purchase exclusively the product of the contracting supplier. The specific antitrust concern is that exclusive dealing contracts threaten to foreclose the relevant product market to other sellers, who may be unable to find buyers for their competing goods or services. On the other hand, courts recognize that many ordinary supply contracts, motivated by legitimate business needs, inevitably foreclose some competing seller from a portion of the market. Accordingly, exclusive dealing contracts are not per se illegal. *See Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1036 (5th Cir. Unit A Feb. 1981) ("The mere existence of an exclusive dealing clause in a contract does not establish an antitrust violation."). Instead, courts apply a "rule of reason" approach to weighing the procompetitive and anticompetitive effects of exclusive dealing

---

17. Plaintiff also cites several SMS internal memoranda as comprising the type of "subjective evidence" referred to by the *McGahee* court.

Having reviewed the documents, the Court agrees that a fact finder could reasonably find them probative of predatory intent.

arrangements. *See, e.g., Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 332–35, 81 S.Ct. 623, 631–32, 5 L.Ed.2d 580 (1961) (weighing a range of factors to determine foreclosure in a competitive coal market under the Clayton Act).[18]

Beginning in July, 1990, Defendant SMS signed exclusive service contracts with Lithotripters, Inc., the general partner in a group of individual partnerships that owns and operates approximately 25 Lithostars.[19] The machines are covered by a separate, but identical, service agreement. *See* Tusa Depo., Plaintiff's Exh. 23, service agreements attached as deposition exhibits 1 & 2; *see also* Defendant's Exh. 79 & 80. The service contracts run for a three-year term and include parts and labor for a price of $150,000 per year. Early termination requires 90 day notice and payment of a 25% liquidated damages charge. Agreement, ¶ 9. Of the 80 Lithostars currently installed in the United States, the Lithotripters, Inc. agreements cover approximately 38% of the Lithostar service market.

Servicetrends argues that the Lithotripters, Inc. service agreements constitute illegal vertical restraints of trade. Defendant SMS responds that exclusive contracts for a three-year period cannot be anticompetitive, that foreclosing only 32%–38% of the relevant market is not "substantial" as a matter of law, and that Lithotripters, Inc. had legitimate business reasons for choosing SMS as its service provider.

The *Tampa Electric* Court suggested that the length of an exclusive dealing contract is relevant to judging the substantiality of the alleged foreclosure. *See Tampa Electric*, 365 U.S. at 334, 81 S.Ct. at 632. After considering various additional factors, the Court held that a 20 year requirements contract between a public utility and a coal company that preempted less than 1% of the relevant market did not violate antitrust laws; *see also Ferguson v. Greater Pocatello Chamber of Commerce*, 848 F.2d 976, 982 (9th Cir.1988) (competitive bidding process for an exclusive six-year lease was not an illegal restraint on competition). As *Tampa Electric* and subsequent · cases make clear, however, the term of the exclusive contract is only one factor to consider in determining the substantiality of market foreclosure.

Defendant asserts that foreclosing only 32% [or 38%] of the market for Lithostar service does not constitute a substantial foreclosure as a matter of law. *See, e.g., Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir.1983) (indicating that the "limited anticompetitive effects" of a contract foreclosing up to 50% of the relevant market rendered it nonexclusionary); *see also Gonzalez v. Insignares*, No. C84–1261A, 1985 WL 2206 (N.D.Ga. June 27, 1985) (Tidwell, J.) (exclusive contract foreclosing at least 40% of relevant hospital market was not an unreasonable restraint). Although some minimum level of foreclosure is certainly insufficient as a matter of law, this Court is not prepared to decide that the competitive impact of foreclosing 32%–38% of a uniquely structured market consisting of 80 service sites and only two competitors is so insubstantial as to be per se legal. *See Tampa*

---

18. Like tying arrangements, exclusive dealing contracts are also prohibited by § 3 of the Clayton Act. Although the possibility of different treatment for similar activities exists depending on whether the court applies the Sherman Act or the Clayton Act, Clayton Act cases are particularly instructive in analyzing exclusive dealing claims brought under the Sherman Act. Nevertheless, there are critical distinctions between the two Acts involving sales of services and plaintiff's burden of proof.

19. The evidence conflicts as to whether Lithotripters, Inc. currently has twenty-four, twenty-six, twenty-eight, twenty-nine, or thirty service agreements with SMS. *See* Jordon Depo., Plaintiff's Exh. 4, p. 22, (Lithotripters, Inc. owns 29 or . 30 Lithostars); McCumber Depo., Defendant's Exh. 45, p. 203 (Lithotripters, Inc. owns 26 Lithostars); Plaintiff's Supplemental Brief (at least 28 machines are under long-term service contracts with SMS); Defendant's Supplemental Brief, Murphy Depo. (Lithotripters, Inc. owns 25 Lithostars, 24 are subject to an SMS service agreement, plus two additional machines owned by a third party with whom Jordon is affiliated). Twenty-six service agreements would equal 32% of the relevant market of 80 Lithostars, while thirty agreements is equivalent to 38%. The . Court resolves this factual discrepancy in favor of Plaintiff and assumes that Defendant's exclusive agreements foreclose approximately 38% of the market for Lithostar service.

*Elec.*, 365 U.S. at 328, 81 S.Ct. at 629 (factors to weigh in determining substantiality).

Defendant also argues that the exclusive agreements with Lithotripters, Inc. were not the product of anticompetitive intentions, but resulted from a pre-existing business practice that benefited both parties. The record shows that SMS executed a total of twelve multi-year service agreements with equipment owners before Servicetrends was incorporated, including six three-year agreements with Lithotripters, Inc. *See Defendant's* Exh. 79. SMS also signed six multi-year contracts with other owners, three of whom are now customers of Servicetrends. *See* Defendant's Exh. 80.

The record contains uncontested evidence of the business justifications for Lithotripters, Inc.'s decision to sign Defendant's exclusive service contracts. Specifically, Lithotripters, Inc. concluded that Servicetrends could not match "the commitment in resources that [SMS] has" and "the number of people, the distribution network" that SMS offered. McCumber Depo., Defendant's Exh. 45, pp. 298–99. Lithotripters, Inc.'s president testified "[i]t was great for us," and "I couldn't conceive then, nor can I conceive now, that there could be any organization that could offer trained personnel, as many as we needed and trained as well as Siemens trains them and the availability that we needed." Jordon Depo., Defendant's Exh. 25, pp. 93, 101. Lithotripters, Inc.'s president explained his service concerns regarding the Lithostar in particular:

> We're talking about high tech equipment ... somebody who didn't know what they were doing could cause an unbelievable mess. If we were talking about MRI's or CT scans, diagnostic equipment to be used on people on a purely elective basis, then I might be interested in finding—going bargain basement shopping for technicians.

> We're talking about therapeutic medical equipment to be used on an emergency basis or urgent basis on people in pain. We can't have a machine down for a week waiting for some guy to come and see it, because we've got people who really need to have it done.

> I would never be interested, very frankly, as long as I'm happy with what I'm getting, to change.

*Id.* at 103. The quality of Servicetrends' repair service is not an issue in this case, but Jordon's remarks are the kind of subjective evidence that shows how an exclusive dealing contract might legitimately serve a buyer's perceived needs without implicating a desire to suppress competition.

Taking into account the extent of the foreclosure and the fact that the practice of executing multi-year service agreements predated the incorporation of Servicetrends, and weighing heavily the buyer's business justifications for signing the service agreements, the Court finds that Defendant's exclusive contracts do not substantially foreclose commerce in the Lithostar service market. Defendant's motion for summary judgment on Count 14 is **GRANTED.**

### 2. *Concerted Refusal to Deal*

 Count 15 also pertains to the service contracts between Lithotripters, Inc. and Defendant SMS. Plaintiff charges: "The agreements entered into by SMS and third parties not to use Servicetrends for the repair and servicing of Siemens Lithostars constitutes a concerted refusal to deal and an unreasonable restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1."

The parties barely argue this claim, essentially relying on the facts and law applicable to Count 14 above. Defendant points out that because no horizontal relationship is involved between SMS and Lithotripters, Inc., Count 15 is likewise properly determined under a rule of reason analysis. The Court notes also that it finds no factual basis to support Plaintiff's argument that the multi-year service contracts, which unambiguously provide a three-year term, were actually "lifetime" agreements.

In accordance with the reasons discussed under Count 14, and in the absence of proof that Lithotripters, Inc.'s independent exercise of business judgment was tainted by Defendant's alleged anticompetitive conduct, Defendant's motion for summary judgment on Count 15 is **GRANTED.**

## E. *DISPARAGEMENT and TORTIOUS INTERFERENCE*

Counts 16, 17 and 18 concern Servicetrends' claims that Defendant falsely stated to potential customers that Plaintiff's replacement parts are inferior:

Count 16: Violation of the Lanham Act based on false and misleading statements in commercial promotion.

Count 17: Violation of the Georgia Unfair Trade Practices Act.

Count 18: Tortious interference with customer business and contracts.

### 1. *The Legal Effect of Disparagement*

Section 43(a) of the Lanham Act prohibits deceitful marketing practices, including disparaging comments that misrepresent the quality of a competitor's goods.[20] To prove a Lanham Act charge, plaintiff must show that defendant's misrepresentations "were material in effect on buying decisions" and "were actually or likely injurious to plaintiffs." *Energy Four, Inc. v. Dornier Medical Sys., Inc.,* 765 F.Supp. 724, 730 (N.D.Ga.1991) (Forrester, J.); *see also U.S. Healthcare Inc. v. Blue Cross,* 898 F.2d 914, 922–23 (3d Cir.1990). Similarly, the Georgia Uniform Deceptive Trade Practices Act provides relief for "[a] person likely to be damaged by a deceptive trade practice," but "[p]roof of monetary damage, loss of profits, or intent to deceive is not required." O.C.G.A. § 10–1–373. Finally, to the extent Plaintiff's tortious interference claim is based on disparagement, Servicetrends must show that SMS "induced a third party or parties not to enter into or continue a business relationship ... for which the plaintiff suffered some financial injury." *Hayes v. Irwin,* 541 F.Supp. 397, 429 (N.D.Ga.1982) (Vining, J.); *see also Stamps v. Ford Motor Co.,* 650 F.Supp. 390, 402 (N.D.Ga.1986) (Shoob, J.) (plaintiff must prove "resulting damage to the contractual relationship").

Servicetrends alleges that SMS representatives stated to three potential customers that Servicetrends' replacement parts are not FDA-approved, when in fact no FDA approval is required. *See* Plaintiff's Answer to Interrogatory 15, Defendant's Exh. 38, p. 16. Plaintiff presents undisputed factual evidence supporting this assertion, as well as statements showing that Defendant's employees said Servicetrends' parts were different than SMS parts and were "refurbished." *See* McCumber Depo., Plaintiff's Exh. 17, p. 180–81, 238; Coffey Depo., Plaintiff's Exh. 32, p. 81.

Without admitting to having made any misrepresentations of fact, Defendant argues that Plaintiff "cannot prove that any of the alleged misrepresentations materially affected the buying decisions of any of the three potential customers or induced any of them not to enter into a contract with Servicetrends." Defendant's Memorandum in Support [# 146], p. 2. According to Defendant, to prevail on its disparagement claims, Servicetrends must prove injury, defined by Defendant as a showing that "some prospective customer declined to do business with Servicetrends based on the alleged disparagement." *Id.* at p. 4.

While proof of monetary damages may not be necessary to sustain every cause of action based on Plaintiff's disparagement claim, a showing that some customer's buying decision was adversely affected is a threshold requirement for each. Even the permissive language of the Lanham Act requires plaintiff to "offer something more than a mere subjective belief that he is likely to be injured ... he must submit proof which provides a reasonable basis for that belief. The likelihood of injury and causation will not be presumed, but must be demonstrated in some manner." *Coca–Cola Co. v. Tropicana Prod., Inc.,* 690 F.2d 312, 316 (2d Cir.1982);

---

**20.** The Lanham Act provides:
Any person who, on or in connection with any goods or services ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which—
(A) is likely to cause confusion ... or to deceive as to the ... approval of his or her goods ... by another person, or

(B) in commercial advertising or promotion, misrepresents the ... qualities ... of his or her or another person's goods ...
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a)(1).

see also *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir.1980) ("despite the use of the word 'believes,' something more than a plaintiff's mere subjective belief that he is injured or likely to be damaged is required before he will be entitled even to injunctive relief"). Also, federal district courts in this circuit generally hold that Georgia deceptive trade practices and unfair competition counts involve the same dispositive questions as the Lanham Act. *See, e.g., Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 839 (11th Cir.1983); *Energy Four, Inc. v. Dornier Medical Sys., Inc.*, 765 F.Supp. 724, 731 (N.D.Ga.1991).

To disprove an adverse impact on customer buying decisions, Defendant points to the fact that two of the three potential customers Plaintiff identified later entered into service agreements with Servicetrends when their contracts with SMS expired. *See* Coffey Depo., Defendant's Exh. 29, p. 76 (Urology Center signed Servicetrends agreement in January, 1993); Onglao Affidavit, Defendant's Exh. 5, ¶ 3 (Sun Medical chose Servicetrends as new service provider for two Lithostars). In addition, the record shows that the third customer, Lithotripters, Inc., chose SMS for business reasons entirely unrelated to any product misrepresentations. *See* Jordan Depo., Defendant's Exh. 4, pp. 101, 103, 130; McCumber Depo., Defendant's Exh. 45, pp. 298–99.

Plaintiff offers no evidence tending to prove that Plaintiff's alleged misrepresentations actually influenced any customer's buying decision. The fact that two of the three parties later selected Servicetrends despite the disparaging remarks tends to show the opposite. The Court has previously considered Lithotripters, Inc.'s business justifications for signing service contracts with SMS, and found them persuasive. Accordingly, the Court **GRANTS** Defendant's motion for summary judgment as to Counts 16 and 17, and also on Count 18 insofar as it relies on disparagement to prove tortious interference.

### 2. Tortious Interference

In Count 18, Plaintiff charges that "SMS has tortiously, willfully and maliciously interfered with Servicetrends' relationships, business and contracts with customers and potential customers, proximately causing damage to Servicetrends." Complaint, ¶ 162. Georgia law provides a cause of action for interference with contractual rights, as well as for interference with business relations.

Under Georgia law, "[i]nterference with contractual rights, such as inducing one to breach his contract with another, is an actionable tort." *Sheppard v. Post*, 142 Ga. App. 646, 647, 236 S.E.2d 680 (1977). Tortious interference with contractual relations requires plaintiff to prove three elements: "(1) the existence of a contractual relationship; (2) interference from the defendant; and (3) resulting damage to the contractual relationship." *Stamps v. Ford Motor Co.*, 650 F.Supp. 390, 402 (N.D.Ga.1986) (Shoob, J.). In this case, Servicetrends does not even contend that a contract existed between Plaintiff and the three customers to whom the alleged misrepresentations were made. Thus, there is no legal or factual basis for Plaintiff's tortious interference with contractual relations charge.

To establish a claim for tortious interference with business relations, a plaintiff must prove that the defendant: "(1) acted improperly and without privilege; (2) purposefully, with malice, and with intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) plaintiff suffered some financial injury as a result." *Southern Business Communications, Inc. v. Matsushita Elec. Corp.*, 806 F.Supp. 950, 962 (N.D.Ga.1992) (Carnes, J.) (citing *DeLong Equip. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1518 (11th Cir.1989)).

As noted above, Servicetrends has produced no evidence that it lost business or suffered cognizable financial injury as a result of Defendant's alleged misrepresentations. Therefore, under Georgia law, Plaintiff cannot recover for tortious interference with business relations. *See Jenkins v. General Hosp. of Humana*, 196 Ga.App. 150, 151, 395 S.E.2d 396 (1990) (affirming summary judgment because "plaintiff is unable to name a single patient he has lost or failed to acquire due to the actions of defendants, nor is plaintiff able to show any financial loss").

Defendant's motion for summary judgment on Count 18 based on conduct other than disparagement is GRANTED.

## F. DAMAGES

 Plaintiff seeks treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, with respect to every antitrust count. Defendant moves for summary judgment as to damages, based on the contention that "the anticipated self-serving testimony of Servicetrends' president, will not meet the requirement that the amount of damages be proven by 'substantial evidence' consisting of more than 'speculation and guesswork.'" Defendant's Memorandum in Support [# 145], p. 4 (citation omitted).

Plaintiff argues that "the current record contains more than enough evidence to provide a reasonable foundation from which a jury could calculate Servicetrends' damages." Plaintiff's Memorandum in Opposition [# 155], p. 99. Servicetrends supports its contention with references to the testimony of its damages expert and its president, and by comparing its experience in the Lithostar service market to the development of the service market for the Dornier HM-3. Also, Plaintiff cites testimony relating to the experiences of other "independent service organizations" competing in the medical equipment markets for x-ray service and for CT Scan service. See id. at pp. 102–03.

 Plaintiff's burden of proof concerning the amount of antitrust damages is "much less severe" than the burden of proving the antitrust violation and its causal relation to plaintiff's injury. Graphic Prod. Distrib., Inc. v. Itek Corp., 717 F.2d 1560, 1579 (11th Cir.1983). "While a jury may not base its judgment on speculation or guess-work ... all that can be required is a just and reasonable—albeit necessarily imprecise—estimate based upon relevant data." Id. As the Supreme Court noted:

[I]n the absence of more precise proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."

Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969) (quoting Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)) (emphasis added).

At this stage of the proceedings, the Court is satisfied that Plaintiff has made the minimal evidentiary showing necessary to avoid summary judgment on the issue of damages. Questions pertaining to the precise amount can await the jury's informed determination. Defendant's motion for summary judgment with respect to damages is therefore **DENIED.**

## IV. PLAINTIFF'S MOTION FOR JUDGMENT ON COUNTER-CLAIMS

Defendant filed counterclaims asserting various business torts in a consolidated declaratory judgment action between Plaintiffs Servicetrends and Steven DeBrock and Defendant SMS, 92–CV–1915–JTC. In this antitrust action, 93–CV–299–JTC, SMS filed counterclaims alleging several antitrust violations, along with a Lanham Act and unfair trade practices claim. Plaintiffs now move the Court for summary judgment on each of Defendant's counterclaims.

### A. SUPPLEMENTAL FACTS AND ANALYSIS

On March 31, 1993, T² Medical, Inc. ("T²") acquired a 100% ownership interest in Servicetrends. T² is a publicly held company with diversified interests in alternate site health care treatment services. According to the company's annual report for fiscal year 1993, T² owned majority interests in 12 lithotripsy partnerships and a minority interest in one other. These lithotripsy ventures operate a total of 25 lithotripsy machines. See Defendant's Exh. 1 [# 148].

#### 1. Geographic Market

 SMS wants to redefine the geographic boundaries of the relevant product

markets to suit its counterclaims. Despite the fact that Defendant's expert testified that the relevant geographic market is the United States, *see* Shapiro Depo., Plaintiff's Exh. A, p. 64, Defendant now suggests that Servicetrends committed antitrust violations in various *local* markets, specifically "the State of Georgia and the Chattanooga, Tennessee metropolitan area," as well as "Minnesota, North Dakota and South Dakota." [21] Plaintiff appropriately notes that Defendant's strategy may backfire, since SMS—the market's only other competitor—must have monopoly power in the balance of the country.

The Court rejects Defendant's attempt to redefine the geographic market. Having emphasized its national presence to justify Lithotripters, Inc.'s willingness to sign multi-year service contracts, having urged the Court that Servicetrends is a demonstrably successful and viable competitor in the national markets for Lithostar parts and service, and having offered no evidence to contradict its own expert's testimony, the Court finds Defendant's current attempt to narrow the size of the relevant geographic market wholly without merit.

### 2. *Product Market*

The Court analyzed Defendant's motion for summary judgment on the basis of three uncontested product markets: (1) the market for second generation lithotripters; (2) the market for Lithostar parts; and (3) the market for Lithostar service contracts. On the basis of Defendant's contention—supported by Plaintiff's expert's testimony—that there is no product market for *all* lithotripters, the Court granted Defendant summary judgment with respect to Plaintiff's antitrust claims pertaining to a product market consisting of all lithotripters.

Nevertheless, SMS does not necessarily agree that the relevant product market consists of the three sub-markets designated by Servicetrends. Defendant explains:

> Servicetrends contends that there exist antitrust markets properly defined as the markets for servicing Lithostars or lithotripters. Siemens Medical denies that such markets exist. It contends that there is a market for lithotripsy systems, which includes sale of equipment and replacement parts and service. Siemens Medical has no power in such a market.

Defendant's Memorandum in Opposition, p. 12 n. 9.

Because the assertion that a single product market exists for *all* lithotripters would be inconsistent with Defendant's previous position, as well as unsupported by any factual evidence, the Court assumes Defendant means to argue that all three products are part of one "systems market" restricted to parts and service for second generation machines.

### 3. *Market Power*

■ Defendant's obvious problem in defining any product market intended to show Plaintiff's monopoly power is that SMS is a well established and much larger company. Consequently, SMS would strain credibility by claiming that the smaller Servicetrends has monopoly power in a national market while SMS has none. Only by introducing a geographic restriction formulated to encompass those areas where Servicetrends' customers are concentrated can SMS hope to prove Plaintiff's market power. For example, although SMS services approximately 85% of the installed Lithostars in the United States, Defendant argues that T² owns, and

---

**21.** Although evidence at trial may force a different conclusion, Mr. Shapiro persuasively explained the relevant geographic market in this case:

> I believe Siemens competes in a US market for lithotripsy systems.... In this case, its really supply-side substitutability that drives the geographic definition of the market. Specifically, a manufacturer who is selling lithotriptors [sic] in one part of the country can quite easily make them available for sale or make a system available for sale in another part of the country.

Shapiro Depo., Plaintiff's Exh. A, p. 65. It follows that the geographic market for the associated parts and service is the same: "[w]hen I said a manufacturer who is selling in one part of the country can sell in another part of the country ... they would have to make the parts and service available in that other part of the country." *Id.* at pp. 65–66.

> This is the same geographic market identified by Servicetrends' expert, Roger Noll. *See* Plaintiff's Exh. B, p. 10.

Servicetrends services, all but two (86%) of the Lithostars operating in the Georgia–Chattanooga area. On a national basis, however, Servicetrends has no more than 16% of the Lithostar service market, a market share legally insufficient to constitute either monopoly power or the dangerous probability of achieving it. *See, e.g., U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 994 (11th Cir.1993).

### 4. *Antitrust Injury*

■ Servicetrends contends that Defendant SMS has not established sufficient antitrust injury to recover damages or to obtain injunctive relief under sections 4 and 16 of the Clayton Act. *See* 15 U.S.C. §§ 15 and 26. The Court agrees.

In *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), and in *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), the Supreme Court held that private plaintiffs bringing claims under § 7 must show injuries caused by a decrease in competition. Examining the requirements of § 4, the *Cargill* Court noted:

> In *Brunswick* ... we held that plaintiffs seeking treble damages under § 4 must show more show more than simply an "injury causally linked" to a particular merger; instead, "plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful."

*Cargill,* 479 U.S. 104, 109, 107 S.Ct. 484, 489 (1986) (quoting *Brunswick,* 429 U.S. 477, 489, 97 S.Ct. 690, 697 (1977)). Although § 16, providing injunctive relief, differs from § 4 in some respects, under both sections "the plaintiff must still allege an injury of the type the antitrust laws were designed to prevent." *Id.* 479 U.S. at 111, 107 S.Ct. at 490.

The antitrust laws were designed to promote competition. Prior to Servicetrends' entry into the service market, SMS was the only supplier of Lithostar parts and service. SMS now complains that it "has been injured by the loss to Servicetrends of ten service contracts which would have produced annual revenue of at least $1 million." Defendant's Memorandum in Opposition [# 152], p. 22. Like the unwilling competitors in *Brunswick,* SMS wants to protest that Servicetrends has introduced an unwelcome element of competition, thereby depriving Defendant of the substantial profits normally enjoyed by the only vendor in the marketplace. The Court finds no evidence to indicate that this unsubstantiated $1 million loss of revenue resulted from Servicetrends' anticompetitive conduct, and not simply from increased competition.

## B. *DEFENDANT'S ANTITRUST COUNTERCLAIMS*

With this introduction, Defendant's antitrust counterclaims can be easily addressed.

### 1. *Section 7 of the Clayton Act*

■ In Count 1, Defendant SMS alleges that T²'s purchase of lithotripsy operating companies and Servicetrends substantially lessens competition "in the market for ownership and operation of lithotripsy equipment in certain geographic areas." Counterclaim [# 22], ¶ 35. In addition, Count 1 alleges that T²'s acquisition of Servicetrends may substantially lessen competition "in the alleged market for repair and service of lithotripters in certain geographic areas." Counterclaim [# 22], ¶ 36.

Section 7 of the Clayton Act prohibits corporate acquisitions of stock that have a reasonable probability of lessening competition within a market:

> No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly the whole or any part of the stock or other share capital ... where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18. Perhaps because the statute is entitled "Acquisition by one corporation of stock of another," and explicitly refers to the purchase of "stock or other share capital," the parties do not argue the significance of T²'s acquisition of lithotripsy partnership interests.

Plaintiff maintains that because T², the acquiring corporation, is not a party to this action, Defendant cannot state a claim for relief under § 7. Defendant responds that the Court has sufficient power over Servicetrends to fashion an appropriate remedy. Having determined that Defendant has shown neither antitrust injury nor a lessening of competition in a national product market, the Court need not address these points. Plaintiff's motion for summary judgment on Count 1 is **GRANTED.**

### 2. *Conspiracy to Monopolize*

Count 2 alleges that Servicetrends, T², and Servicetrends' president Warlick conspired to monopolize the lithotripter service market in certain geographic markets. The parties appear to agree that the so-called *Copperweld* doctrine prevents recognizing a conspiracy between the three parties after T²'s acquisition of Servicetrends, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769–73, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984) (a parent and its wholly owned subsidiary cannot conspire), but Defendant claims that the conspiracy began prior to the acquisition. The alleged conspiracy, says SMS, violates Sections 1 and 2 of the Sherman Act.

■ This circuit has defined the elements of a conspiracy to monopolize under both Section 1 and 2:

> The elements of a conspiracy to monopolize under Section 2 are: (1) an agreement to restrain trade, (2) deliberately entered into with the specific intent of achieving a monopoly rather than a legitimate business purpose, (3) which could have had an anti-competitive effect, and (4) the commission of at least one overt act in furtherance of the conspiracy.... The elements of a conspiracy to restrain trade under Section 1 are (1) an agreement to enter a conspiracy (2) designed to achieve an unlawful objective.... The plaintiff must also prove (3) "actual unlawful effects [or] facts which radiate a potential for future harm" to competition.

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir.1993). However, there is no requirement that a conspiracy have a dangerous probability of success. *Id.*

Thus, conspiracy under Section 2 requires specific intent, an agreement, and at least one overt act. Section 1 does not demand intent evidence, but requires proof of an anticompetitive effect.

SMS characterizes pre-merger discussions between T² and Servicetrends as a conspiracy to gain control of the market for Lithostar service in the state of Georgia. Aside from having rejected Defendant's geographic limitation, the Court has reviewed the cited testimony and finds only legitimate business concerns for increased efficiency, better capitalization, and cost savings motivating the merger. *See* Allegra Depo., pp. 10, 23–24, 70–71; Wheelock Depo., pp. 18, 97, 203, 207–08; De-Brock Depo., pp. 142, 171–73; Warlick Depo., pp. 122–24, 155, 159, 196–97. Defendant points to no evidence establishing a specific intent to create a monopoly or proof of an anticompetitive effect. "Federal antitrust law requires a plaintiff to introduce evidence that tends to exclude the possibility that the defendants acted ... legitimately." *U.S. Anchor*, 7 F.3d at 1002. Therefore, Plaintiff's motion for summary judgment on Count 2 is **GRANTED.**

### 3. *Monopolization and Attempt to Monopolize*

■ Count 3 alleges that Plaintiffs "possess monopoly power in the market for ownership and operation of lithotripters in the State of Georgia and the Chattanooga metropolitan area, Minnesota, North Dakota and South Dakota" and that Plaintiffs "possess market power in the alleged market for repair and service in the State of Georgia" and in Chattanooga. Counterclaim [# 22], ¶ 45. Count 4 alleges an attempt to monopolize certain geographic areas throughout the United States. Counterclaim, ¶ 50.

First, there is no market for ownership and operation of lithotripters involved in this case—T² is not a party and Servicetrends neither owns nor operates lithotripters. Second, the Court has determined that Servicetrends does not possess the requisite market power to monopolize or to render dangerously probable an attempt to monopolize any relevant product market in the geographic United States. Although Defendant correct-

ly states that the determination of the relevant product market is a question of fact, the record raises no genuine dispute of fact regarding the national bounds of the product markets at issue. Accordingly, Plaintiff's motion for summary judgment on Counts 3 and 4 is **GRANTED.**

## C. *DEFENDANT'S BUSINESS TORT COUNTERCLAIMS*

### 1. *Disparagement and Unfair Trade Practices*

■■■ Counts 5 and 6 assert that Servicetrends violated the Lanham Act and the Georgia Unfair Trade Practices Act by making disparaging statements about the quality of Defendant's products. *See* Part III.E. (discussing the two Acts). Defendant SMS alleges Warlick falsely told customers that SMS made unauthorized and illegal promises with respect to Lithostar service contracts. *See* Warlick Depo., Defendant's Exh. 17, pp. 94, 97–101; Warlick–Schmidt Conversation, Defendant's Exh. 29. The Court has reviewed these exhibits and finds no reasonable basis for Defendant's claim. Defendant also says Servicetrends falsely told customers that Servicetrends sells replacement parts purchased from the same sources as Siemens' parts. *See* DeBrock Letter to The Urology Center, dated January 15, 1993, Defendant's Exh. 30 ("In fact, every part we have ever utilized has been purchased directly from Siemens or from one of their vendors.").

Plaintiff replies that DeBrock's statement regarding Servicetrends' source of Lithostar component parts was true when made. Although the uncontested facts show that Servicetrends regularly purchases components from OEM's instead of buying the complete modular replacement parts from Siemens, an examination of DeBrock's testimony establishes that, at the time the suspect statement was made, DeBrock was buying parts from the same manufacturers that sold the parts to SMS. For example, DeBrock purchased spark gaps from a Massachusetts company known as EE & G. EE & G's technical department confirmed to DeBrock that the spark gap ordered by Servicetrends was exactly the same part EE & G supplied to SMS. *See* DeBrock Depo., Plaintiff's Exh. F, pp. 366–67; *see also* pp. 393–94.

Defendant presents no evidence that DeBrock's statement to the Urology Center regarding the sources of Servicetrends' parts was false when made. Therefore, Plaintiff's motion for summary judgment on Counts 5 and 6 is **GRANTED.**

### 2. *Misappropriation of Confidential Information*

Count 8 alleges that Plaintiffs maliciously misappropriated trade secrets and confidential information in violation of common law and the Georgia Trade Secrets Act of 1990. Counterclaim, ¶ 68. Count 10 charges "breach of duty of loyalty," based on the circumstances surrounding DeBrock's departure from SMS to join Servicetrends and his subsequent disclosure of purportedly confidential information. *See* Counterclaim, ¶¶ 76–79.

■■■ The Georgia Trade Secrets Act of 1990, O.C.G.A. §§ 10–1–760–67, supersedes other civil remedies for misappropriation of a trade secret. § 10–1–767(a). The Act defines a "trade secret" as information—including technical or nontechnical data, financial plans, or customer lists—that derives economic value from not being known or readily ascertainable to others, and that "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." § 10–1–761(4).[22] The Georgia statute pro

---

22. Georgia courts have long held that trade secrets are protectable only when they truly are secrets. The Georgia Supreme Court described the typical plaintiff's allegations in a trade secrets case in *Vendo Co. v. Long:*

> The allegations in this connection are in substance: that the defendant became familiar with plaintiff's trade secrets, experimental data, and other confidential information concerning names of customers, equipment, prices

of machines, price quotations to customers, new models of plaintiff's machines not yet on the market and their prices, method of doing business and procedures....

> The allegations in this case respecting trade secrets and confidential information seem to encompass practically every phase of the plaintiff's business.... But in none of these does there appear to be any element of secrecy or confidential information that is peculiar to the

vides relief in the form of an injunction, damages, and award of attorneys' fees. §§ 10–1–762, 763, 764.

The facts show that DeBrock was employed by SMS in 1987 and became a Lithostar service engineer in Atlanta in October, 1990. DeBrock Depo., Defendant's Exh. 2, pp. 24–25, 56–58, 81–82. DeBrock was an at-will employee who never had an employment contract for a definite period of time. DeBrock Affidavit, Plaintiff's Exh. C. He left SMS' employment in July of 1992, and is now Servicetrends' Vice President of Technical Operations. DeBrock Affidavit, Plaintiff's Exh. C. While at SMS, DeBrock received extensive lithotripsy and Lithostar training. DeBrock Depo., pp. 24–25; 65–79.

Although Defendant describes an elaborate system for classifying and handling designated confidential information, SMS does not deny Plaintiff's well documented assertion that "[a]ll of the information that DeBrock and other field service engineers were provided, such as manuals or wiring diagrams, was also provided to SMS customers." *See* Transcript of Proceedings, Plaintiff's Exh. G, p. 10; DeBrock Depo., pp. 595–96.[23] In at least one instance, SMS provided a customer's employees comprehensive training in servicing a Lithostar. Rankin Depo., Defendant's Exh. 39, p. 58. In response to a request for a water cleaning kit, Servicetrends itself received a schematic diagram of the water system and shockheads, complete with repair instructions, all marked "proprietary data" and "confidential." Transcript of Proceedings, Plaintiff's Exh. H, pp. 16–18.

The Court concludes from the evidence presented that Defendant's wide distribution of the allegedly confidential technical data removes any legal protection it might otherwise have had as trade secrets. Moreover, undisputed facts also prove that DeBrock

returned all manuals, drawings, notes and client lists to SMS before his departure. DeBrock Depo., Plaintiff's Exh. F, pp. 185–86; Christensen Depo., Plaintiff's Exh. L, p. 149. DeBrock, then, took from SMS only the technical information residing in his mind.

Trade secrets need not be in the form of written data to warrant protection, *see Avnet, Inc. v. Wyle Labs., Inc.*, 263 Ga. 615, 619, 437 S.E.2d 302 (1993), but Georgia law generally does not prevent a departing employee from using the skills and information he acquired at work. "A person who leaves the employment of another has a right to take with him all the skill he has acquired, all the knowledge he has obtained, all the information that he has received, so long as *nothing is taken that is the property of the employer." Vendo Co. v. Long*, 213 Ga. 774, 778, 102 S.E.2d 173 (1958); *see also Smith v. Mid–State Nurses, Inc.*, 261 Ga. 208, 209, 403 S.E.2d 789 (1991) (employer's customer list held in employee's memory was not protectable as a trade secret). Thus, DeBrock was under no obligation to keep the skills and customer knowledge he acquired at SMS confidential, first because SMS did not maintain the confidentiality of its technical data, and second because the law does not prohibit the exploitation of an employee's accumulated knowledge. It follows that Servicetrends could not have induced DeBrock to breach a confidentiality obligation. The Court finds that Plaintiffs Servicetrends and DeBrock did not misappropriate confidential information and **GRANTS** Plaintiff's motion for summary judgment on Counts 8 and 10.

### 3. *Tortious Interference*

Count 7 alleges "tortious interference with employment relationships," claiming that Plaintiffs sought to maliciously injure Defendant's business by attracting away key em-

---

plaintiff's business and known only to it and its employees.
*Vendo Co. v. Long*, 213 Ga. 774, 776–77, 102 S.E.2d 173 (1958); *see also Textile Rubber & Chem. Co. v. Shook*, 243 Ga. 587, 589, 255 S.E.2d 705 (1979) (Georgia definition of a trade secret requires that it is "known only to its owner and those of his employees to whom it must be confided in order to apply it to the uses intended") (citation omitted).

**23.** *See also* Haist Affidavit, Plaintiff's Exh. J, ¶ 4 ("There is no information concerning the Lithostar which is kept secret from customers purchasing the equipment. A customer is given the same service manual with a purchased Lithostar that service technicians such as myself are supplied with."); Conner Affidavit, Plaintiff's Exh. K (same).

ployees. Counterclaim [# 122], ¶¶ 64, 65. Count 9 claims that Servicetrends intentionally interfered with SMS' ongoing business and contractual relationships with its customers. Counterclaim, ¶ 73.

▮▮▮▮ Count 7 rests on Defendant's contention that Servicetrends is illegally hiring Defendant's key employees. Under the broader category of interference with business or contractual relations, Georgia courts have held that interference with an employment relationship can be tortious, even if employment is at-will. *See, e.g., Ott v. Gandy*, 66 Ga.App. 684, 684, 19 S.E.2d 180 (1942). However, a competing employer is not liable for hiring away an at-will employee so long as it does not use "wrongful means" and the recruiting company's purpose is to advance competition. *See E.D. Lacey Mills, Inc. v. Keith*, 183 Ga.App. 357, 363, 359 S.E.2d 148 (1987). Georgia law also permits an individual to freely compete with his previous employer: "[T]he law grants a former employee a privilege to compete with his former employer for customers and employees." *Id.* Thus, the law permits destruction of a competing business by attracting away its customers in the fair course of trade, but not "destruction or substantial injury by means of attracting away all or a large percentage of personnel upon whom it must depend to function, especially if other circumstances such as the use of confidential information . . . are involved." *Id.* at 364, 359 S.E.2d 148 (quoting *Architectural Mfg. Co. v. Airotec, Inc.*, 119 Ga.App. 245, 251, 166 S.E.2d 744 (1969) (internal punctuation omitted). In the absence of malicious conduct, Servicetrends and DeBrock are entitled as a matter of law "to engage in direct competition, to hire others who formerly worked for the employer, even to persuade them that their company offers better economic opportunity, so long as they interfere with no contractual rights." *Id.* at 250–51, 166 S.E.2d 744.

▮▮▮▮ Defendant SMS—itself a wholly-owned subsidiary of a German parent—is a large company, with annual sales of $1.8 billion, seven subsidiary corporations, and 26 district offices. MacKinnon Depo., Plaintiff's Exh.V, pp. 18–19, 41, 105. Each district office is staffed with field service engineers.

*Id.* at 105. SMS' Atlanta district office has five service supervisors and approximately 28 field service engineers working on a variety of Siemens equipment. Christensen Depo., Plaintiff's Exh. L, pp. 10–17. Conversely, Servicetrends is a small company, with service and parts revenue just over $2 million and a total staff of 21 persons. Bennett Depo., Defendant's Exh. 9 [Motion for Summary Judgment], p. 86; DeBrock Affidavit, Plaintiff's Exh. C.

Four Servicetrends employees, including DeBrock, are former SMS employees. Servicetrends hired Daniel Jordon, previously a SMS field service engineer located in Utah. Jordon, now based in Sacramento, California, works exclusively on servicing Dornier HM–3 machines for Servicetrends. Jordon Depo., Plaintiff's Exh. I, pp. 59–66, 81. Rob Austin left his position as an SMS field service engineer in Atlanta and now works in Milwaukee servicing Lithostars for Servicetrends. Austin Depo., Plaintiff's Exh. N, pp. 10–11, 34. The final transplanted employee, Alfredo DeLeon, was laid off by SMS in September, 1992, six months before Servicetrends hired him. DeBrock Depo., Plaintiff's Exh.F, pp. 223–24.

On the basis of the record before it, the Court concludes with confidence that SMS does not face the "destruction or substantial injury" addressed by Georgia law and experienced by Lacey Rug Mills, for example, when defendants hired away 17 of Lacey's 21 sales representatives. Although SMS may resent the departures of its three engineers, and may even feel the pinch of competition in a small measure relative to its size, it presents no evidence that Servicetrends engaged its "key" employees for any purpose other than fair competition. It does not seem unusual, or illegal so far as this Court can determine, that the employer of a corps of maintenance engineers operating alone in an obviously lucrative service market would be the target of recruiting efforts by invading competitors. Plaintiff's motion on Count 7 is **GRANTED**.

▮▮▮▮ Count 9 maintains that Plaintiffs have interfered with SMS' customer relationships. As the discussion above indicates, an employee's knowledge of the firm's custom-

ers is not a trade secret. *See Textile Rubber & Chem. Co. v. Shook*, 243 Ga. 587, 592, 255 S.E.2d 705 (1979). Here, DeBrock and Servicetrends are entitled to competitively exploit their knowledge of Lithostar customers gained as a result of employment with SMS. *See, e.g., DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1519 (11th Cir.1989) (customer lists are not protectable from post-employment disclosure and use) (citing Georgia cases). In fact, the law provides a privilege to foster such competition. *See E.D. Lacey Mills, Inc. v. Keith*, 183 Ga.App. 357, 362–63, 359 S.E.2d 148 (1987) (noting also that an employee breaches no fiduciary duty to an employer simply by making plans to enter a competing business while he is still employed).

The elements of tortious interference with contractual rights and with business relations are set out in Part III.E.2. above. In this instance, the Court finds no evidence that Plaintiffs acted improperly or without privilege to interfere with SMS' contractual or business relationships with customers. SMS does not even claim that a customer breached its service contract as a result of Servicetrends' successful sales efforts. The Court therefore finds no merit to Defendant's Count 9 and **GRANTS** Plaintiff's motion for summary judgment.

### 4. *Unjust Enrichment*

Count 11 charges unjust enrichment, as a result of the unlawful conduct described in Counts 1–10. Counterclaim, ¶ 82.

All counterclaims having been dismissed on summary judgment, Defendant's claim of unjust enrichment is without foundation. Plaintiff's motion for summary judgment is **GRANTED.**

### V. *PLAINTIFF'S MOTION TO ADD DEFENDANTS*

■ In May of 1993, Plaintiff moved the Court to amend its Complaint to add as new Defendants Siemens AG, Lithotripters, Inc., and William Jordan, the Chief Executive Officer of Lithotripters, Inc. [# 50]. Following a hearing to resolve numerous outstanding discovery disputes in October, 1993, the Court deferred action on Plaintiff's motion to add defendants.

In essence, Plaintiff maintains that Siemens AG controls the pricing and availability of the Lithostar and its replacement parts, and that Lithotripters, Inc. and Jordan are engaged in a conspiracy with Defendant to "boycott" Servicetrends. Plaintiff argues that Rule 20, or alternatively Rule 19(a), operate so as to require joinder of these three absent parties.

Having reviewed the record in exhausting detail, the Court is convinced that joining these additional parties is not necessary to obtain Plaintiff's complete relief. Moreover, adding defendants would further complicate trial preparation and result in needless expense and delay. The parties have completed extensive discovery and have produced sufficient information to convince the Court that Plaintiff is capable of pursuing its remaining claims without adding defendants. Therefore, Plaintiff's motion is **DENIED.**

### VI. *SUMMARY*

The Court has decided the following matters:

| | |
|---|---|
| Defendant's Motion for Summary Judgment: | |
| Monopolization and Attempt, Counts 6, 9, 10, 12, 13 | GRANTED |
| Counts 5 and 8, [as to predatory pricing] | DENIED |
| Tying Claims, Counts 1, 2, 3, 4 | GRANTED |
| Predatory Pricing Claims, Counts 7 and 11 | DENIED |
| Exclusive Dealing, Count 14 | GRANTED |
| Concerted Refusal to Deal, Count 15 | GRANTED |
| Disparagement, Counts 16 and 17 | GRANTED |
| Tortious Interference, Count 18 | GRANTED |
| Damages | DENIED |
| Plaintiff's Motion for Summary Judgment: | |
| Clayton Act § 7, Count 1 | GRANTED |
| Conspiracy to Monopolize, Count 2 | GRANTED |
| Monopolization and Attempt, Counts 3 and 4 | GRANTED |
| Disparagement and Unfair Trade Practices, Counts 5 and 6 | GRANTED |
| Misappropriation of Confidential Info., Counts 8 and 10 | GRANTED |
| Tortious Interference, Counts 7 and 9 | GRANTED |
| Unjust Enrichment, Count 11 | GRANTED |
| Plaintiff's Motion to Add Parties | DENIED |

**SO ORDERED.**